# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ROGER DEAN GILLISPIE,                    :

                                                       Case No. 3:09-cv-471

               Petitioner,

     -vs-                                      Magistrate Judge Michael R. Merz

DEB TIMMERMAN-COOPER,
     Warden,

                Respondent.                    :

## DECISION AND ORDER GRANTING CONDITIONAL WRIT OF HABEAS CORPUS

This is a habeas corpus action brought by Petitioner Roger Dean Gillispie pursuant to 28 U.S.C. § 2254 seeking relief from his convictions for nine counts of rape with firearm specifications, three counts of kidnaping with firearm specifications, three counts of gross sexual imposition, and one count of aggravated robbery with a firearm specification and resulting sentences which total twenty-two to fifty-six years.

The parties have consented to plenary magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and the matter has been referred on that basis.  Doc. 9, PageID 99.

### Background Facts

The Second District Court of Appeals, Montgomery County, Ohio described the facts of the offenses of which Petitioner was convicted as follows:

> In February 1991, Roger Dean Gillispie was convicted by a jury of
> nine counts of rape, three counts of kidnaping, three counts of gross

sexual imposition, and one count of aggravated robbery. The rape, kidnaping and aggravated robbery counts each carried a firearm specification. The trial court imposed an aggregate sentence of a minimum of 22 years to a maximum of 56 years in prison.

I

Gillispie's convictions stem from two separate sexual assaults in August 1988.

On August 5, 1988, in the early to mid-afternoon, S.C. drove alone to a Rite–Aid drug store on North Dixie Drive in Harrison Township to purchase some hand lotion. After making the purchase, she returned to her car. As she prepared to drive away, a man jumped into the front passenger seat and pointed a chrome handgun at her head. The assailant told S.C. to do as he said or he would shoot her.

The assailant directed S.C. to drive behind a vacant building and park next to a dumpster. After she stopped the car, the man took the keys and threw them under the front passenger seat. He then exposed and fondled S.C.'s breasts, instructed S.C. to unfasten her pants, unzipped his own pants, and forced her to perform oral sex on him. S.C. was instructed to spit the ejaculate into a paper bag. After this, S.C. began to ask the assailant questions to stall him from making a further attack. During the questioning, he said his name was "Roger," that he was a security guard, and that he had been sexually molested as a child. The man stated that he wanted S.C. to drive him to Columbus. S.C. asked her assailant if she could smoke a cigarette. The man permitted it and lit one for himself, although S.C. did not recall seeing him smoke it. Afterwards, the assailant got out of S.C's car and told S.C. to exit. Instead, S.C. grabbed the keys from beneath the seat and drove away.

S.C. did not immediately contact the police concerning the rape. Shortly after the incident, S.C. read an article in the newspaper concerning the rape of two other women in the Miami Township area. The article prompted S.C. to report to the Miami Township police that she too had been attacked and raped. Approximately two weeks after the assault, S.C. was interviewed by Miami Township Detective Gary Bailey and a composite picture of the suspect was developed.

S.C. described the assailant as approximately six feet tall, 200 pounds, stocky build with short, light brown hair and mustache, light

2

blue eyes, tanned skin, and strong odor of cologne. S.C. stated that he wore a button down shirt with the top buttons undone and he wore a gold chain with a medallion.

On Saturday, August 20, 1988, at around 7 p.m., twin sisters C.W. and B.W. were preparing to leave from the parking lot of the Best Products store near the Dayton Mall when a man claiming to be a store security guard pushed his way into the back seat of their car and brandished a small silver handgun. The assailant thrust the gun into B.W.'s ribs and directed her to drive away from the lot. As they drove, the man asked C.W. to light him a cigarette; the women did not remember his smoking it, noting that they did not smell smoke. The assailant also told them that he wanted a ride to Columbus.

The assailant directed B.W. to a secluded area near a bridge, ordered the women from the car, and forced them at gunpoint into the woods to a fallen log. Once there, the assailant forced the twins to expose their breasts, which he fondled with his hands and the pistol. In addition, the assailant forced each woman to perform oral sex on him three times individually and once together. The women testified that, during the course of the attack, the assailant talked frequently and said, among other things, that his name was "Roger," that he had been sexually molested as a child by his grandfather, that he was from Columbus and Texas, and that his job was killing people for $1,000.

The assailant then blindfolded the women and led them back to their car and placed them on the floor of the back seat. He drove them back to the Best Products parking lot where he took $83 from their purses. The assailant told the women to lie on the floor through two songs on the radio or he would kill them. The women did as they were told and the man escaped.

Later that evening, the women reported the incident to their parents who contacted the Miami Township police. The police requested that the women come to the police station. Once there, the women were separately interviewed regarding the incident and each was taken to a local hospital for a throat culture. The next day, the women were again interviewed by the police and each assisted in developing a joint composite picture of the offender.

*State v. Gillispie,* Nos. 22877, 22912, 2009 Ohio 3640, 2009 WL 2197052 at *1-*7 (Ohio App. 2nd

Dist. July 24, 2009); Return of Writ, Attachment 5 thereto (Doc. 16) (hereinafter "Return Att. _");

PageID 1512-60.

### State Court Proceedings

On October 4, 1990, the Montgomery County Grand Jury returned an indictment

charging Mr. Gillispie with nine counts of rape in violation of Ohio Revised Code § 2907.02(A)(2)

with firearm specifications, three counts of kidnaping in violation of Ohio Revised Code § 2905.01

with firearm specifications, three counts of gross sexual imposition in violation of Ohio Revised

Code  § 2907.05(A)(1), and one count of aggravated robbery in violation of Ohio Revised Code  §

2911.01(A)(1) with a firearm specification. Return, Att.1, PageID 197-76.  On October 11, 1990,

Mr. Gillispie pled not guilty to all counts in the Indictment.  *Id.*, PageID 178.  Mr. Gillispie has

proclaimed his innocence of these offenses consistently since then.

Prior to trial, Mr. Gillispie filed several motions including a Motion to Suppress Pre-

Trial Identification, a Motion to Produce Brady Material which specifically sought statements that

the State did not include in its discovery material, and a Motion to Suppress evidence seized at his

home on the day police arrested him. *Id.*, PageID 179-80; PageID 181-83; PageID 184-85.

After the trial court apparently ordered the State to produce any additional *Brady*

material, the State filed a Response to Order to Produce Brady Materials, representing that it had no

additional *Brady* material to produce.  *Id.*, PageID 186-87.  Mr. Gillispie subsequently filed a

Memorandum in Support of Motion to Suppress Identification Testimony in which he primarily

challenged the photo spread identification and the in-court identification as "the fruit of the

suggestive photo spread identification." *Id.*, PageID 188-91.  On January 4, 1991, the trial court

4

denied Mr. Gillispie's Motion to Suppress Pre-Trial Identification and his Motion to Suppress.  *Id.,* PageID 196-200.

Mr. Gillispie subsequently filed a Notice of Alibi in which stated that on August 5, 1988, he was with Marie Woods and/or Brian Poulter and that on August 20, 1988, he was in Kentucky.  *Id.*, PageID 201.

The matter proceeded to trial and on February 12, 1991, the jury returned its verdicts finding Mr. Gillispie guilty of all counts in the Indictment with the exception of counts sixteen and eighteen, the aggravated robbery counts.  *Id.*, PageID 202-52.

Mr. Gillispie filed a Motion for a New Trial on February 26, 1991, and a Supplemental Memorandum in Support of Motion for New Trial. *Id.*, PageID 253-54; 255-341. Mr. Gillispie argued in support of his motion that there was newly discovered evidence which was exculpatory, that the identification process was tainted, and that there was insufficient evidence to support his convictions.  *Id.*  The trial court held a hearing on Mr. Gillispie's motion and subsequently granted the motion on the basis of newly discovered evidence, to wit: one pubic and four head hairs.  *Id.*, PageID 354-57.

The court set the matter for trial on the same counts in the Indictment except the two robbery counts on which the first jury found Mr. Gillispie not guilty.  On May 28, 1991, Mr. Gillispie filed a Notice of Alibi in which he again stated that on August 5, 1988, he was with Marie Woods, Brian Poulter, and Lisa Glasser, and that on August 20, 1988, he was in Kentucky.  *Id.*, PageID 358-59.  Mr. Gillispie also filed a Motion to Incorporate Previously File[d] Motions.  *Id.,* PageID 360-61.

On June 12, 1991, the jury returned guilty verdicts on all sixteen counts with

5

specifications as charged in the Indictment.  *Id.*, PageID 362-406.  Mr. Gillispie filed a Motion for

Judgment of Acquittal and a Motion for Mistrial and/or New Trial.  *Id.*, PageID 407-11; 412-23.

The trial court apparently denied Mr. Gillispie's motions because in a Termination Entry dated July

2, 1991, that court sentenced Mr. Gillispie to a aggregate sentence of twenty-two to fifty-six years.

*Id.*, PageID 424.

Mr. Gillispie timely appealed his conviction to the Montgomery County Court of

Appeals (Case number CA12941).  Return Att. 2, PageID 429.  Instead of filing a merit brief in the

court of appeals, on July 18, 1992, Mr. Gillispie filed a Motion for a New Trial and a Motion for

Finding that Defendant was Unavoidably Delayed in Discovery of New Evidence in the trial court

which the trial court denied on July 29, 1992. *Id.,* PageID 430-59; 460-62; *see also,* PageID 471-73.

On July 14, 1992, the court of appeals entered a Show Cause Order because Mr.

Gillispie had failed to file his merit brief.  *Id.*, PageID 463-64.  In response, on August 2, 1992, Mr.

Gillispie filed in the court of appeals a Motion to Remand for Consideration of New Trial.  *Id.*,

PageID 465-73.

On August 4, 1992, Mr. Gillispie filed a Notice of Appeal, Motions for Finding of

Indigency [and] Appointment of Counsel, and Motion to Consolidate Appeal in which he, *inter alia,*

appealed from the trial court's July 29, 1992, denial of his Motion for New Trial and the appeal was

assigned case number CA13585.  *Id.,* PageID 474-76.  The court of appeals initially declined to

consolidate the appeals in CA12941 and CA13585 but eventually reversed itself and consolidated

the two appeals.  *Id.,* PageID 477-78; 533-34.

Mr. Gillispie filed his merit brief and raised the following three assignments of error:

**ISSUE I.**  THE TRIAL COURT ERRED IN UPHOLDING THE
JURY CONVICTION OF THE DEFENDANT AND OVERRULING

6

DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR MISTRIAL AND/OR NEW TRIAL BECAUSE THE "ALLEN CHARGES" GIVEN AT TRIAL HAD THE EFFECT OF LOWERING THE BURDEN OF PROOF BELOW THE REQUIRED BEYOND A REASONABLE DOUBT AND THEREBY VIOLATING DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION.

**ISSUE II.**  THE TRIAL COURT ERRED IN UPHOLDING THE JURY CONVICTION OF THE DEFENDANT AND OVERRULING DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR MISTRIAL AND/OR NEW TRIAL BECAUSE THE JURY VERDICT WAS ERRONEOUS, NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE, AND NOT BEYOND REASONABLE DOUBT THAT DEFENDANT HAD COMMITTED THE OFFENSES AS CHARGED, AND THE VERDICT AND SENTENCE THEREBY VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION.

**ISSUE III.**  THE TRIAL COURT ERRED IN SENTENCING DEFENDANT TO CONSECUTIVE SENTENCES FOR FIREARM SPECIFICATIONS BECAUSE THERE WAS NO SUBSTANTIAL EVIDENCE BEYOND REASONABLE DOUBT THAT THE OFFENDER USED AN OPERABLE HANDGUN PURSUANT TO O.R.C. 2929.71 AND 2941.141 AND THEREBY VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION.

*Id.*, PageID 482.

On January 21, 1993, the court of appeals overruled Mr. Gillispie's three assignments of error and affirmed the trial court's decisions.  *State v. Gillespie* [sic]*,* Nos. 12941, 13585, 1993 WL 10927 (Ohio App. 2nd Dist. Jan. 21, 1993); Return Att. 2, PageID 569-87.

7

Mr. Gillispie timely appealed to the Supreme Court of Ohio, *Id.,* PageID 589, and in his Memorandum in Support of Jurisdiction, he raised the following propositions of law:

> PROPOSITION OF LAW NO. 1:
> "When a jury is deadlocked in a criminal case, a trial court should give a supplemental jury instruction with caution and only when the circumstances are appropriate.  If after giving such a charge, the jury remains deadlocked, the trial court should order a mistrial."
>
> PROPOSITION OF LAW NO. 2:
> "An impermissibly suggestive photographic display lacks reliability when it is shown to a witness nearly two years following the offense and when not corroborated by any physical or independent evidence."

*Id.*, Page ID 592-634.  On August 11, 1993, the Ohio Supreme Court denied Mr. Gillispie leave to appeal and dismissed his appeal as not involving any substantial constitutional question.  *State v. Gillispie,* 67 Ohio St.3d 1421 (1993)(table); Return Att. 2, PageID 652.

Mr. Gillispie filed a Post-Conviction Petition pursuant to Ohio Revised Code § 2953.21(A) on March 30, 1994, *Id.*, PageID 653-58, making the following claims of ineffective assistance of counsel:

> A)  COUNSEL  FAILED  TO  USE  THE  OUT-OF-STATE SUBPOENA PROCESS FOR A MATERIAL WITNESS
>
> B) COUNSEL FAILED TO FILE THE NECESSARY PRE-TRIAL MOTIONS
>
> C)  COUNSEL  FAILED  TO  ESTABLISH  ANY  THEORY  OF DEFENSE

*Id.*  On May 18, 1994, the trial court sustained the State's motion for summary judgment and dismissed Mr. Gillispie's post-conviction petition.  *Id.*, PageID 671-74.

Mr. Gillispie appealed the denial of his petition and raised the following assignments of error:

   1. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT DENIED APPELLANT'S PETITION FOR POST CONVICTION RELIEF WITHOUT FIRST HOLDING A HEARING.

   2. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT FAILED TO ISSUE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

*Id.,* PageID 675-76; 677-700. On February 1, 1995, the court of appeals overruled Mr. Gillispie's

assignments of error and affirmed the trial court. *State v. Gillispie,* No. CA 14595, 1995 WL 41334

(Ohio App. 2nd Dist. Feb. 1, 1995); Return Att. 2, PageID 720-26.

   Mr. Gillispie timely appealed to the Ohio Supreme Court and in his Memorandum

in Support of Jurisdiction raised the following proposition of law:

   1. WHEN A DEFENDANT FILES A MOTION FOR POSTCONVICTION RELIEF UNDER REVISED CODE SECTION 2953.21, AND WHEN THAT PETITION ALLEGES THAT THE TRIAL ATTORNEY WAS INEFFECTIVE, A TRIAL COURT MUST MOLD A HEARING ON THE PETITION

*Id.*, PageID 727-28; 729-51. On June 14, 1995, the Ohio Supreme Court denied Mr. Gillispie leave

to appeal and dismissed his appeal as not involving any substantial constitutional question. *State*

*v. Gillispie,* 72 Ohio St.3d 1538 (1995)(table); Return Att. 2, PageID 760.

   On September 7, 1997, Mr. Gillispie filed motions in the trial court for an order

compelling the State to preserve any and all evidentiary items, specifically any and all hair samples,

and for an order allowing him to have an expert perform DNA testing on any and all hair samples.

*Id.*, PageID 761-73. The court granted Mr. Gillispie's motions on September 9, 1997, and ordered

the State to preserve any and all evidence it held in Mr. Gillispie's case including, but not limited

to, any and all hair samples. *Id.*, PageID 764-65. On February 13, 1998, Mr. Gillispie engaged the

services of an expert and moved the court for an order directing the State to release hair samples to

Mr. Larry Dehus for DNA testing. *Id.*, PageID 766-67.

    During the pendency of the DNA-related motion, on August 7, 1998, Mr. Gillispie filed a motion for leave to file a motion for a new trial based upon newly discovered evidence. *Id.*, PageID 777-79. He represented that he had recently acquired the results of DNA testing of Glen Rodgers, that Mr. Rodgers was currently incarcerated for committing the same type of offenses of which Mr. Gillispie had been convicted, and that if the hair samples which were the subject of Mr. Gillispie's prior motions proved to be from Mr. Rodgers, Mr. Gillispie would be entitled to a new trial. *Id.* During the briefing on Mr. Gillispie's motion, the State represented that on the dates of the crimes for which Mr. Gillispie was convicted, Mr. Rodgers was incarcerated. *Id.*, PageID 783-91. Subsequently, Mr. Gillispie filed a supplemental memorandum in support of his motion requesting that he be permitted to test the hairs and compare the results with the F.B.I. DNA records of convicted rapists. *Id.*, PageID 792-94.

    On February 8, 1999, the trial court issued an order in which it stated that it would postpone its decision on Mr. Gillispie's motion related to a new trial until the parties briefed the issue of the June, 1991, availability of DNA testing in Ohio courts. *Id.*, PageID 798-800. The trial court subsequently denied Mr. Gillispie's motion for a new trial. *Id.*, PageID 811-15. The court did, however, grant leave to Mr. Gillispie to have the hairs tested "under conditions satisfactory to the court." *Id.*

    On January 19, 2001, Mr. Gillispie filed a motion for evidentiary hearing alleging that the State failed to turn over the hairs for DNA testing. *Id.*, PageID 816-18. The State replied that it was not responsible for the missing hairs. *Id.,* PageID 819-22. The trial court construed Mr. Gillispie's motion as a motion to show cause to hold the State in contempt, held a hearing on the

motion, and subsequently denied it.  *Id.*, PageID 823-28.

      Mr. Gillispie appealed the trial court's decision and raised the following assignment

of error:

> **Issue Presented for Review and Argument**
> Because the State cannot show that the missing [ ] hairs were not
> exculpatory evidence and hairs ended up missing while they were
> under State control, due process requires that the decision of the
> lower court be reversed and that the convictions be ordered
> dismissed.

Return Att. 3, PageID 831-32; 833-42.  On March 29, 2002, the court of appeals overruled Mr.

Gillispie's assignment of error and affirmed the trial court's decision.  *Id.*, PageID 862-69.

      Mr. Gillispie appealed to the Ohio Supreme Court and in his Memorandum in

Support of Jurisdiction he raised the following proposition of law:

> IF THE PROSECUTION INTENDS TO PRESERVE
> POTENTIALLY EXCULPATORY EVIDENCE AFTER A
> DEFENDANT HAS BEEN CONVICTED, OR IF THE
> PROSECUTION IS ORDERED TO PRESERVE POTENTIALLY
> EXCULPATORY EVIDENCE AFTER CONVICTION, THE
> FAILURE TO DO SO MEANS THAT ANY CONVICTIONS
> SHOULD BE REVERSED AND THE CHARGES DISMISSED SO
> LONG [ ] STATE CANNOT SHOW THAT THE MISSING
> EVIDENCE WAS NOT EXCULPATORY.

*Id.*, PageID 870-72; 873-84.  On July 3, 2002, the Ohio Supreme Court denied Mr. Gillispie leave

to appeal and dismissed his appeal as not involving any substantial constitutional question.  *State*

*v. Gillispie,* 96 Ohio St.3d 1441 (table); Return Att. 3; PageID 900.

      Mr. Gillispie filed a Motion for Mitochondrial DNA Analysis in the trial court on

March 5, 2003.  *Id.,* PageID 901-04.  On May 20, 2003, the court entered  an Order to Transport

Exhibit directing that defense counsel and the assistant prosecutor jointly transport the hair samples

to the Miami Valley Regional Crime Laboratory from where the samples would be subsequently

sent to a laboratory in Pennsylvania for mitochondrial DNA testing.  *Id.*, PageID 905-06.  The court

entered the order again on July 3, 2003.  *Id.*, PageID 907.

On October 28, 2004, Mr. Gillispie filed an Application for DNA Testing in addition

to that already done.  *Id.*, PageID 908-1096.  On January 20, 2005, the court entered an order in

which it denied Mr. Gillispie's request for DNA testing of hair samples because that testing had been

performed pursuant to a July, 2003, order it had entered and ordered the State to provide information

"as to whether any semen or seminal fluid may exist on the clothing of [one of the victims]".  Return

Att. 4, PageID 1106-07.  The State subsequently informed the court the clothing at issue had been

tested prior to trial,  there was no seminal fluid on the clothing, and the clothing had been released

to the victim.  *Id.,* PageID 1108-12.  On March 16, 2005, the court denied Mr. Gillispie's motion

for DNA testing noting that the State did not have possession of any of the items he wanted tested.

*Id.*, PageID 1119-22.

Mr. Gillispie filed  a Petition for Post-Conviction Relief and Motion for New Trial

on February 23, 2008.  *Id.*, PageID 1123-87.  In that petition/motion, Mr. Gillispie argued that new

evidence established the following incidents of alleged police misconduct:

> (1) Gillispie's name was originally brought forth as a suspect earlier
> than what was revealed at trial by Rick Wolfe, an angry co-worker of
> Gillispie.  Wolfe had previously served as a police officer in the same
> police department investigating Gillispie.  Wolf appeared to the
> detectives in charge to have a work-related vendetta against Gillispie,
> and furthermore had no independent basis to believe that Gillispie
> committed these crimes;
>
> (2) the veteran detectives on the case investigated this "tip" and
> concluded that Gillispie was not a viable suspect for several
> independent reasons;
>
> (3) after the veteran detectives left the department and the case was
> re-assigned to Moore, Moore was able to obtain identifications of

12

Gillispie by the victims through a highly improper and contaminated identification process;

(4) reports in the file given to Moore which revealed that Gillispie had originally been investigated and eliminated as a suspect by a more senior and experienced detectives in his department then disappeared and were not turned over to the defense at trial;

(5) at trial, Moore and Wolfe "sanitized" the record to make it appear to the jury that the case against Gillispie had started much later in time when Moore took over the case (in other words, Wolfe and Moore hid from the jury the fact that Wolfe had previously tried to have Gillispie implicated and the veteran detectives had recognized Wolfe's vendetta, the lack of a match between Gillispie and the perpetrator, and had eliminated Gillispie as a suspect);

(6) Wolfe attempted to downplay and mitigate his vendetta against Gillispie, which had proved so distasteful and suspicious to the original investigating detectives, by "staging" Wolfe's delivery of the photos of 5 different possible suspects to Moore, to make the origins of the case against Gillispie appear innocent and innocuous; and

(7) the state's evidence at trial, through the false or incomplete testimony of various witnesses, including several current and former police officers, pulled off this misleading recitation of events, the truth of which was unknown to the defense, the jury, the court, and presumably even the prosecution.

*Id.* In addition, Mr. Gillispie argued that new evidence would reveal that Det. Moore: (1) obtained campground receipts related to Mr. Gillispie's alibi which Det. Moore never turned over to the defense; (2) committed perjury to avoid admitting that he obtained and failed to disclose the receipts; (3) harassed a potential defense witness whose truthful testimony may have threatened his (Det. Moore's) case to the point where she was unable to testify for the defense, turned in reports that falsified statements made by the witness, tried to convince her to testify to facts that were not true, tried to indoctrinate her in the belief that Mr. Gillispie was guilty, and ultimately threatened to make false public accusations of a sexual nature against her if she did not cooperate with him. *Id.* Mr.

Gillispie also argued that new evidence indicates that the perpetrator of the crimes for which he was convicted is likely Kevin Cobb and that new scientific developments in the field of eyewitness identification cast doubt on the identifications of Mr. Gillispie as the perpetrator. *Id.* Mr. Gillispie concluded that his conviction should be overturned on two independent grounds: (1) for constitutional reasons relating to police misconduct, perjury, witness tampering, and *Brady* violations; and (2) on the basis of newly discovered evidence sufficient to raise a reasonable doubt and thus change the outcome of the verdict entitling him to a new trial. *Id.* On July 9, 2008, the trial court overruled Mr. Gillispie's motion for a new trial and his petition for post-conviction relief. *Id.*, PageID 1278-93. Subsequently, Mr. Gillispie filed a Motion to Supplement the Record and for Reconsideration of Denial of New Trial which the court denied on August 13, 2008. *Id.*, PageID 1293-1305; 1309-10.

Mr. Gillispie appealed the trial court's decisions and the court of appeals consolidated the cases for appeal. *Id.*, PageID 1312-13; 1314-15; 1316-19; 1320. He raised the following assignments of error:

ASSIGNMENT OF ERROR NO. 1

1. The lower court erred in finding no *Brady* violations.

A. The lower court erred in finding no *Brady* violation in the State's failure to disclose supplemental reports eliminating Gillispie as a suspect and containing other exculpatory information, such as the fact that a key witness against Gillispie had a vendetta against him.

B. The trial court erred in finding that the missing campground receipts were not *Brady* material.

ASSIGNMENT OF ERROR NO. 2

1. The trial court erred in ignoring the unrefuted evidence of witness

14

tampering by Detective Moore.

ASSIGNMENT OF ERROR NO. 3

1.  The trial court abused its discretion in denying Gillispie's Motion for New Trial which presented compelling new evidence of innocence.

    A.  The emergence of a new alternative suspect, Kevin Cobb, obligated the trial court to grant Gillispie's motion for new trial because this evidence had a reasonable probability of changing the verdict.

    B.  New advances in the field of eyewitness identification present new evidence that the photo line-up in combination with the tactics of Detective Moore produced a faulty identification by the victims in this case.

    C.  The various forms of new evidence, viewed together rather than in a vacuum, would change the outcome of a new trial.

*Id.*, PageID 1321-68.  On July 24, 2009, the court of appeals affirmed the trial court's denial of Mr. Gillispie's post-conviction petition, overruled his first two assignments of error, and sustained his third assignment of error in part and remanded the matter for a hearing on his claim that he should be granted a new trial based on new evidence of an alternative suspect.  *State v. Gillispie*, 2009 WL 2197052, *supra.*;  Return Att. 5, PageID 1512-60.  Mr. Gillispie filed a Motion for Reconsideration of *Brady* Issue Surrounding Supplemental Reports which the court of appeals denied.  Return Att. 6, PageID 1563-70; 1574-78.[1]

       Mr. Gillispie appealed to the Ohio Supreme Court and in his Memorandum in

---

[1]  The Montgomery County Clerk of Courts PRO System indicates as follows: (1) the trial court held a hearing over a three day period in 2010 and denied Mr. Gillispie's motion for a new trial on December 29, 2010; (2) Mr. Gillispie appealed the trial court's decision on January 28, 2011, Case No. CA 24456; (3) the matter is scheduled for oral argument before the court of appeals on November 1, 2011. See http://www.clerk.co.montgomery.oh.us/pro/

Support of Jurisdiction he raised the following propositions of law:

> **Proposition of Law No. 1:** In a case where the defendant's defense was to impeach the integrity and credibility of the arresting detective's investigation, a constitutional violation occurs pursuant to *Brady v. Maryland* (1963) 373 U.S. 83, and *D'Ambrosio v. Bagley* (N.D. Ohio Mar. 24, 2006), Case No. 1:00 CV 2521, affirmed, (C.A. 6 2008), 575 F.3d 489, when the State fails to disclose written reports showing that, unknown to defendant and his attorney, the original investigating detectives initially assigned to the case had previously investigated and eliminated the defendant as a suspect on the grounds, among others, that: (1) he did not fit the specific psychological profile of the perpetrator developed by the detectives for that particular case based on their years of experience in investigating crimes of that nature; and (2) the detectives' investigation of the defendant turned up facts that eliminated the defendant as a suspect, such as the fact that the defendant's pants size did not match the pants size of the perpetrator as reported by the victim.

> **Proposition of Law No. 2:** In a case where the defendant first learns nearly 20 years after his conviction that *Brady* material was not disclosed prior to trial, and obtains the affidavit of a law enforcement witness stating that exculpatory evidence existed, to the best of that witness' recollection, in written reports that had last been in the possession of the State, the State—who is at fault for not disclosing the report in a timely manner when memories were fresh—bears the burden of proving that the undisclosed report was not exculpatory.

*Id.*, PageID 1579-81; 1582-1656. On December 2, 2009, the Ohio Supreme Court denied Mr. Gillispie leave to appeal and dismissed his appeal as not involving any substantial constitutional question. *State v. Gillispie,* 123 Ohio St.3d 1510 (2009), Return Att. 6, PageID 1672.

## Proceedings in this Court

On December 15, 2009, Mr. Gillispie filed his Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody in which he pled the following Ground for Relief:

16

**Ground for Relief 1**

**The State's failure to disclose to the defense, prior to or during trial, supplemental reports written by the original investigating detectives, which eliminated Petitioner as a suspect, violated Petitioner's due process rights pursuant to *Brady v. Maryland.* U.S. Const. amend V, XIV.**

Doc. 1, PageID 1-40. After the parties engaged in extensive motion practice, on March 10, 2011, this Court held an evidentiary hearing at which the Court heard testimony from Gary Bailey, Steven Fritz, and Dennis Lieberman. Doc. 44, PageID 3723-25; Doc. 46, PageID 3922-4150. On June 8, 2011, the Court entered a Decision and Order in which the Court, *inter alia,* found that *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011), which the Supreme Court decided after the evidentiary hearing in this matter, precludes this Court from considering, in deciding the 28 U.S.C. § 2254(d)(1) question in Mr. Gillispie's case, evidence that the parties introduced at the March, 2011, hearing. Doc. 62, PageID 4506-09. However, the Court noted that it agreed, at least initially, with Mr. Gillispie's arguments that: (1) if the court decides the § 2254(d)(1) issue favorably to Mr. Gillispie, he would be entitled to a *de novo* consideration of his *Brady* claim in this Court; and (2) Mr. Gillispie would be entitled to have the evidence taken at the evidentiary hearing and arguably the materials he submitted with his Motion to Expand the Record (Doc. 52, PageID 4414-23), considered on any *de novo* consideration because holding the hearing before deciding the § 2254(d)(1) issue was, at most, harmless error if the § 2254(d)(1) issue is determined favorably to Mr. Gillispie. *Id.*, PageID 4508. Finally, in the June 8, 2011, Order, the Court advised the parties that it considered the § 2254(d)(1) issue ripe without further briefing. *Id.,* PageID 4509.

**Standard of Review**

17

**I.** **Antiterrorism and Effective Death Penalty Act of 1996**

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") applies to all habeas cases filed after April 25, 1996. *Herbert v. Billy,* 160 F.3d 1131 (6th Cir. 1998), *citing, Lindh v. Murphy,* 521 U.S. 320 (1997). Since Mr. Hanna filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C. § 2254 embodied in the AEDPA are applicable to his Petition.

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides:

...
(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

The AEDPA also provides that a factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).  In addition, pursuant to the AEDPA, before a writ may issue on a claim that was evaluated by the state courts, the federal court must conclude that the state court's adjudication of a question of law or mixed question of law and fact was "contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

A state court's decision is contrary to the Supreme Court's clearly-established precedent if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law; or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case", "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407-08. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003); *Williams,* 529 U.S. at 407, 409. An *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Id.* at 410 (emphasis in original). In sum, Section 2254(d)(1) places a new constraint on the power of a federal court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. *Id.* at 412 (Justice O'Connor, concurring).

A state court decision is not "contrary to" Supreme Court law simply because it does not specifically cite Supreme Court cases. *Early v. Packer,* 537 U.S. 3 (2002). Indeed, "contrary to" does not even require awareness of Supreme Court cases, so long as neither the reasoning nor the result of the state-court decision contradicts them. *Id.* at 8. The AEDPA prohibits the

overturning of state court decisions simply because the federal court believes that the state courts

incorrectly denied the petitioner relief:

> By mistakenly making the "contrary to" determination and then proceeding to a simple "error" inquiry, the Ninth Circuit evaded Section 2244(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts".

*Id.* at 11.

For the purposes of the AEDPA, the habeas court reviews the last state court decision

on the merits. *Howard v. Bouchard,* 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied,* 546 U.S. 1100

(2006).

The AEDPA standard of review applies only to "any claim that was adjudicated on

the merits in state court proceedings." *Danner v. Motley,* 448 F.3d 372, 376 (6th Cir. 2006).  A state

court's failure to articulate reasons to support its decision is not grounds for reversal under the

AEDPA.  *Harrington v. Richter,* 562 U.S. ___, 131 S. Ct. 770, 792 (2011); *Williams v. Anderson,*

460 F.3d 789, 796 (6th Cir. 2006), *citing, Harris v. Stovall,* 212 F.3d 940 (6th Cir. 2000), *cert. denied,*

432 U.S. 947 (2001).  Where the state court fails to adjudicate a claim on the merits, the habeas court

conducts an independent review of a petitioner's claims. *Williams, supra.*  That independent review,

however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot

grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.

*Williams, supra.*

**Merits of the Petition**


In his Petition, Mr. Gillispie has raised only one Ground for Relief.  Indeed, Mr. Gillispie acknowledges that "[w]hile [he] raised numerous claims in the state court, the only issue that is a part of his Petition is the *Brady* claim stemming from the missing supplemental reports that eliminated Gillispie as a suspect." Doc. 1, PageID 35.  The thrust of Mr. Gillispie's position is that he is entitled to habeas relief because the state court misapplied and/or misinterpreted *D'Ambrosio v. Bagley,* No. 1:00cv2521, 2006 WL 1169926 (N.D. Ohio Mar, 24, 2006) *aff'd*,  527 F.3d 489 (6th Cir. 2008).  Petition, Doc. No1. 1 PageID 36.

The Montgomery County Court of Appeals was the last state court to address Mr. Gillispie's *Brady* claim on the merits.  That court rejected the claim as follows:

> In his first assignment of error, Gillispie claims that, contrary to *Brady*, he was not provided all of the campground receipts for the weekends of the rapes and supplemental police reports, which would have demonstrated the "true origins" of the case against Gillispie, Wolfe's bias against Gillispie, and Wolfe's aggressive tactics to have charges brought against Gillispie, and that Gillispie had previously been excluded as a suspect by Detectives Bailey and Fritz.
>
> The prosecution's withholding of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley* (1995), 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490, quoting *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. A "reasonable probability" of a different result is demonstrated when the government's suppression of evidence "undermines the confidence in the outcome of the trial." *Id.* at 434. "Both exculpatory and impeachment evidence may be the subject of a Brady violation,

so long as the evidence is material." *State v. Gibson*, Butler App. No. CA2007–08–187, 2008–Ohio–5932, at ¶ 25, citing *Bagley*, 473 U.S. at 676. However, no constitutional violation occurs if the evidence that was allegedly withheld is merely cumulative to evidence presented at trial. *State v. Church* (Apr. 30, 1999), Clark App. No. 98–CA–36; *State v. Aldridge* (1997), 120 Ohio App.3d 122, 145, 697 N.E.2d 228.

...

Second, Gillispie argues that the trial court erred in finding no *Brady* violation with respect to the State's failure to disclose supplemental police reports, which indicated that Gillispie had once been eliminated as a suspect.

At Gillispie's second trial, the State presented several witnesses who discussed the course of the police investigation and the development of Gillispie as a suspect. First, Robert Burling, a thirteen year veteran of the Miami Township Police Department, testified that he conducted an initial investigation of the rapes of the twins and collected evidence. Burling took witness statements from the sisters, drove them to Sycamore Hospital for throat cultures, collected their clothing, and processed B.W.'s 1979 Chevy Camaro for evidence, including looking for fingerprints, and collecting a Polaroid picture and two bandanas. Burling obtained a physical description of the rapist.

Gary Bailey, who in 1988 was a detective corporal with the Miami Township Police Department, testified that he was assigned to investigate the August 20, 1988, rapes the following day. Bailey's supervisor, Sergeant Steven Fritz, also assisted. Bailey interviewed C.W. and B.W. separately and obtained a physical description of the perpetrator and the perpetrator's self-reported first name. The same day, Bailey and the twins went to Best Products and to the scene of the rapes. Bailey had the twins create a composite of their assailant, which was distributed to the media, local retailers, and other police departments. Bailey testified that he worked on the case "[u]ntil all the good leads ran out." Bailey denied that he had "occasion at any time to interview or come in contact with a Roger Gillispie." On cross-examination, Bailey testified that he received more than 20 leads during his investigation, and many of those individuals came close to the description of the perpetrator. Bailey indicated that he received photographs for some of those leads and used them "to go ahead and either keep the fellow as a good suspect or go ahead and

eliminate him as a suspect." Bailey did not create any photo lineups to show to B.W. and C.W. He explained on redirect examination that none of the individuals matched or closely matched the description given by the twins, and there were no "suitable suspects to go ahead and create a photo spread."

Robert Miller, a security supervisor with the Harrison Division of General Motors and one of Gillispie's supervisors, testified that he saw the composites in 1988 and thought they resembled Gillispie. Miller informed the chief of plant security, but received no feedback. When that chief left about a year later, Miller relayed his suspicion to the new chief of security, Keith Stapleton.

Richard Wolfe, who supervised operation of the security department for five divisions of General Motors between 1987 and 1991, contacted the Miami Township Police Department in late 1989 or early 1990 regarding the rapes at Best Products. Wolfe acquired the composites from the police to see if the composites looked like Gillispie. After viewing the composites with Stapleton, Wolfe took the security identification cards of Gillispie and four other individuals to the police department. Wolfe stated that he talked with Fritz and Moore and told them that "some of us thought it looked like [Gillispie]."

On June 15, 1990, the case was delegated to Detective Moore, who had been assigned to the detective section in 1989. Moore reviewed the file to date and felt that Gillispie's security identification card "looked very much" like the suspect. Moore ran a background check on Gillispie, "obtained his physical build," and attempted to make contact with him. On June 21, 1990, Moore sent Gillispie's security card to MVRCL to have a photograph made for use in a photo lineup. In July 1990, Moore created a photo lineup and showed it separately to C.W. and B.W. Both selected Gillispie's photograph. Moore showed another photo lineup to S.C. in August 1990; she also identified Gillispie as her assailant. Moore interviewed Gillispie in August 1990, and executed a search warrant at his home in September 1990. Moore did not pursue any other individuals as potential suspects.

In his petition for post-conviction relief and motion for a new trial, Gillispie argued that he had been considered as a suspect by Bailey and Fritz prior to Moore's involvement in the case, and that Gillispie had, in fact, been eliminated as a suspect by those detectives. Gillispie claimed that Moore "sanitized" the case file to make it

23

appear that he (Gillispie) did not come to the officers' attention until June 1990. In support of these arguments, Gillispie provided affidavits by Bailey, Fritz, and Lieberman. Fritz's affidavit states, in relevant part:

"3. During April of 1990, Bailey and I received a tip on this case from a Rick Wolfe, a supervisor of a local GM plant. Wolfe brought over the picture of Roger Dean Gillispie, an employee that Wolfe had just terminated at GM. Wolfe said that Gillispie looked like the composite sketch of the perpetrator, and Gillispie's first name was 'Roger,' the same name used by the rapist. Bailey and I eliminated Gillispie as a suspect because of the extreme differences in Gillispie's physical appearance compared to that of the rapist, and because Gillispie, with a solid job and clean record, did not fit the profile of the brazen rapist in this case. Also, Wolfe's tip was suspicious. The WANTED poster for the case had been posted for nearly 2 years at the GM plant, but Wolfe waited until he had a nasty fight with Gillispie, and fired him, before suddenly deciding that he should turn in Gillispie as a suspect. Wolfe had no credible explanation for why Gillispie should be a suspect, other than the fact that Wolfe simply hated Gillispie for work-related reasons. As tips go, the one from Wolfe regarding Roger Dean Gillispie was a particularly unreliable one."

Fritz also prepared a supplemental affidavit, which stated, in part:

"3. Since writing my First Affidavit, I have reviewed my files and prior testimony to refresh my recollection about timelines and events surrounding Rick Wolfe and how Gillispie became involved in this case. When Rick Wolfe originally brought Gillispie's photo over to the department, it must have been in 1989 or early 1990. I know this for a few reasons. First, Bailey was still in charge of the case under my supervision when this happened. I am sure of this. Bailey was still in the detectives division, and was still in charge of the case. The case was still active when this occurred. Second, a substantial period of time passed between the time that Wolfe first brought Gillispie's photo over, and the second time when Wolfe brought over a group of photos after Bailey had left the department and I was about to turn the file over to Moore. This is what I recall in addition to what I said in my First Affidavit:

"a) Sometime while Bailey was still in charge of the case, in 1989 or early 1990, Wolfe brought over a single photograph to the department as a possible suspect. This photo was of Roger Dean Gillispie. When

Wolfe brought this photograph over to the department, he gave it to us and presented Gillispie as a suspect at a formal meeting attended by myself, Bailey, Wolfe, someone else from GM, and I believe Chief Thomas Angel and Captain Marvin Scothorn. As I said before, Bailey and I ultimately eliminated Gillispie as a suspect.

"b) After that initial meeting, I recall Wolfe calling me on occasion and asking me about whether we were going to do anything about Gillispie. Although I don't remember my specific responses, I eventually told him that we were not going to bring charges against Gillispie and did not consider him a good suspect. I can recall discussing Wolfe's 'tip' with Bailey and both of us making sure that we crossed every 'T' and dotted every 'I,' because Wolfe had been an officer in the department before going to GM and was still friends with some of the supervisors. We wanted to make sure that we did our 'due diligence' and could explain why we were not going to pursue Wolfe's 'tip' without having to embarrass Wolfe or get in hot water with any of his friends in the department.

"c) The meeting in which Wolfe brought over Gillispie's photo, and our process of eliminating Gillispie as a suspect, were the subject of supplemental reports written by Bailey and submitted to me. I can recall discussing these reports with Bailey for the reasons set forth at paragraph (b). I can recall reviewing these reports and putting them in the file that was later inherited by Moore. It has recently been brought to my attention that these reports were never turned over by Moore to the defense, and possibly not to the prosecution. I had no knowledge of this, and assumed until recently that everything had been turned over.

"d) Before I left the department, Wolfe tried again by bringing over several photos. This was after Bailey and I had already eliminated Gillispie and had filled in Wolfe that we were not moving forward with Gillispie as a suspect. * * * I do not think that I even looked at the photos provided by Wolfe at this point, but just stuck them in the file. * * *."

Bailey's affidavit reiterated much of the information in Fritz's affidavit regarding the meeting with Wolfe and others, his investigation of Gillispie, the elimination of Gillispie as a suspect, and the creation of supplemental reports. He added that, as part of his "due diligence" he noted a discrepancy between the pants size noted by a victim when the perpetrator dropped his pants and Gillispie's build. In addition, Bailey stated, in part:

"6. At Gillispie's trial, I simply came to court and answered the questions asked of me in an honest way. At the second trial, I was not asked anything about my investigation of Gillispie. At the first trial, I was asked whether I had ever followed up on any 'leads' with respect to Gillispie. I answered, 'No, sir.' I cannot recall now why I answered 'no,' but it must have been because I did not consider Gillispie to be serious enough of a tip to consider it a lead.

"7. * * * When I testified, it never occurred to me that there might be a discovery violation. I naturally would have assumed that the law had been complied with and that I simply was not asked about these reports, and the facts and events contained in the reports, for reasons that did not concern me. * * * "

Attorney Dennis Lieberman stated in his affidavit that he did not receive Bailey's supplemental reports and did not receive the information in his reports orally or in any other form. He stated that, to the contrary, "the State made it appear as if the case against Gillispie originated when Wolfe, in April 1990, brought over photographs of 5 GM employees and gave them to Detective Moore. The history of Wolfe having tried earlier with a single photo of Gillispie, and of Bailey and Fritz eliminating Gillispie as a viable suspect, was not made available to me, or the jury." Lieberman further indicated that "[i]t would have been very important and helpful to me at trial to have had this information. My defense at trial was misidentification of Gillispie by the victims. * * * Had I had the information contained in the supplemental reports regarding the early case history in this case, I would have used it to impeach Wolfe, Moore and Bailey. * * * I believe that this information would have changed the outcome of the trial had it been made known to me. I consider this extremely important and powerful information that was not provided in violation of Brady."

In its opposition memorandum, the State emphasized that Fritz was Gillispie's investigator at the time of trial, and he should have known about the alleged missing detective reports regarding Gillispie's elimination as a suspect. The State further asserted that the detectives' decision to eliminate Gillispie as a suspect was baseless, that Gillispie matched the description of the assailant, and that neither the jury nor the defense was misled about how and when Gillispie came to the attention of the police.

In his reply memorandum, Gillispie disputed that he should have known of the supplemental reports due to Fritz's involvement as an

26

investigator for the defense. Fritz provided a second supplemental affidavit, indicating that he was instructed by Lieberman "to perform specific tasks, such as obtain particular documents or interview witnesses as he instructed. I did not go over the discovery provided by the State. I was not hired to sit through the trial to make sure that the early stages of the investigation were presented to the jury in a fair and accurate light. It never occurred to me that they would not be presented in an accurate light."

Fritz further stated:

"I was operating under the assumption the entire time that Mr. Lieberman* * * had possession of the reports created by Bailey, and approved by me, eliminating Gillispie as a suspect. When he had questions about something, he asked me. I let him do the attorney work, and I did the footwork of an investigator when I was asked to do something. * * * My job was to get things Lieberman didn't have already, and what he told me he needed. * * * " (Emphasis in original.)

Lieberman also denied in a supplemental affidavit that he should have had knowledge of the supplemental reports:

"2. The idea that I, as Mr. Gillispie's defense attorney, knew or should have know[n] of the Brady violation (relating to the undisclosed reports by Detective Bailey eliminating Gillispie as a suspect) because Mr. Steven Fritz worked in a limited capacity as an investigator for the defense is without merit. Like any investigator who is hired by a defense lawyer who has limited funds, Mr. Fritz * * * was hired to perform specific tasks on an ad hoc basis. * * * Mr. Fritz was not involved in 'big picture' analysis or strategy or anything of that nature. As would be the case with any defense investigator, Fritz was not hired to go through discovery to see if any reports were missing * * *. I depended on the good faith of the police department, as I am entitled to do by law, to ensure that proper discovery was made and that the State's witnesses would not perjure themselves at trial."

Lieberman indicated that the he would have used the supplemental reports at trial to impeach Wolfe and Moore about the origins of the case against Gillispie, to have Bailey testify as to investigative techniques and practices, and to attack the motives and competence of Moore's investigation.

27

The trial court rejected Gillispie's assertion that the alleged removal of supplemental police reports from the case file constituted a Brady violation. The court explained:

"The Court finds that the reports were allegedly created by Bailey, reviewed by Detective Steven Fritz and placed in the file by Fritz prior to trial. Of particular importance to the Court is that Fritz, who was lead detective on this case, left the Miami Township Police Department in June of 1990 and went to work for the defense to prepare for the trial. If those documents existed, Fritz would have known it prior to trial. Any attempt by the police to 'sanitize' the record of the investigation would have been futile because Fritz had first hand knowledge. Because the records, or the lack thereof was known at the time of trial, this is not new evidence.

"Pursuant to *Brady*, the defense bears the burden of proving that the State suppressed or did not disclose material, exculpatory evidence. If this evidence existed, the defense knew of its existence because its investigator, Fritz, put it into the file. It is hard to imagine the need for further disclosure. Certainly due diligence at the time would have required the Police to produce these records or declare that they did not exist. Further, there is absolutely no admissible evidence that these records, if they exist, are material or exculpatory. The defense has not met its burden."

Gillispie asserts that the trial court's ruling ignores the unrefuted affidavits of Fritz and Lieberman. In his appellate brief and at oral argument, Gillispie relied upon *D'Ambrosio v. Bagley* (N.D.Ohio Mar. 24, 2006), Case No. 1:00 CV 2521, 2006 WL 1169926 affirmed, (C.A.6 2008), 527 F.3d 489, to support his claim that the opinions of the original investigating officers constitute *Brady* evidence.

As an initial matter, we agree with Gillispie that the trial court did not reasonably conclude, as a matter of law, that the State did not need to disclose the supplemental reports, because Gillispie had access to that information from Fritz. Although Fritz performed work as an investigator for the defense prior to Gillispie's trial, the affidavits of Fritz and Lieberman, if believed, indicate that Fritz's duties as an investigator for the defense would not have reasonably led defense counsel to have discussions with Fritz regarding the supplemental reports. Fritz's role was limited to discrete assignments, and he did not review the complete discovery packet from the State as part of his duties. Unlike information that Gillispie should have known based on

28

personal knowledge, such as the individuals who were present with him when he was camping, the defense had no basis for believing that they lacked any police reports regarding Gillispie that were prepared prior to June 1990, when Moore took over the case. Moore was questioned at a December 1990 suppression hearing as to whether Gillispie was a suspect prior to June 1990, when Rick Wolfe brought some security identification cards to him, and Moore responded negatively. Thus, the defense had no reason to ask Fritz about whether Gillispie's name had been raised as a potential suspect prior to Moore's investigation when neither Moore nor the discovery packet gave any hint that Gillispie had previously been considered. The State offered no evidence to refute Gillispie's assertion that the defense had no knowledge, at the time of trial, that Gillispie had been considered and eliminated as a suspect.

Nevertheless, the trial court properly concluded that Gillispie failed to establish that the supplemental reports, if they exist, are potentially exculpatory or material. The evidence allegedly contained within the reports concerned how Gillispie first came to the attention of the police through Gillispie's former supervisors at GM and that the initial investigating detectives concluded that Gillispie was not a viable suspect. As stated above, Wolff [sic] and Miller testified that they brought Gillispie to the attention of the police based on their comparison of Gillispie's appearance with the composites. Although defense counsel may have preferred to know that the GM supervisors had an alleged vendetta against Gillispie, that fact has little significance as to Gillispie's guilt or innocence. The allegation that the GM employees may have been motivated by a "vendetta" against Gillispie when they spoke with the detectives had no bearing on the strength of the State's case against Gillispie or whether Gillispie had committed the offenses.

In addition, the police detectives' opinion that Gillispie was not a viable suspect has little, if any, relevance to Gillispie's guilt or innocence. The affidavits do not assert that the detective's opinion was based on the discovery of evidence that would have exonerated Gillispie, such as evidence to support an alibi.

In this respect, Fritz and Bailey's opinions are distinguishable from the police officers' opinions in *D'Ambrosio*. In a petition for a writ of habeas corpus, *D'Ambrosio* claimed, among other things, that the prosecution violated Brady when it failed to disclose reports from the two initial investigating officers, who had surmised the victim had been killed elsewhere and dumped in Doan's Creek; these reports

29

were contrary to the State's theory of the case at trial that *D'Ambrosio* and two other men, Edward Espinoza and Thomas Keenan, had taken the victim to Doan's Creek and killed him there.FN5 Agreeing with *D'Ambrosio*, the federal district court found that "the defense undoubtedly could have used this evidence to impeach Espinoza's testimony during trial. * * * [A]ny information that would tend to undercut Espinoza's account of the murder could have been used to impeach him."

> FN5. *D'Ambrosio* was convicted of aggravated burglary and the kidnaping and murder of Anthony Klann. According to the evidence at trial, D'Ambrosio and Espinoza had gone with Keenan to look for Paul Lewis, who Keenan believed had stolen drugs from him. The three encountered Klann, a friend of Lewis. They forced him into Keenan's truck and questioned him repeatedly about Lewis's whereabouts. Eventually, Keenan drove the group to Doan's Creek, where Keenan cut Klann's throat with a knife and pushed him into the creek. After Klann got up and began to run, D'Ambrosio grabbed the knife from Keenan, caught up with Klann, and killed him.

The court rejected the Respondent's assertion that Brady did not apply, because the "mere" opinion of the initial investigating officers was inadmissible under the Ohio Rules of Evidence. The court recognized that the United States Supreme Court "has held that there is no Brady violation where the prosecution withheld evidence that would have been inadmissible." *Id.*, citing *Wood v. Bartholomew* (1995), 516 U.S. 1, 6, 116 S.Ct. 7, 113 L.Ed.2d 1. The court noted, however, that several Ohio appellate districts have construed Evid.R. 701 to permit a police officer to testify about his or her own crime scene conclusions based on that officer's personal observations. The court thus concluded that the initial investigating officers would have been permitted to testify regarding their impressions of how the victim was killed.

Unlike the reports in *D'Ambrosio*, Bailey and Fritz's affidavits do not indicate that their supplemental reports contained undisclosed information that contradicted the State's theory of how the rapes occurred or that tended to show that Gillispie was not the perpetrator. Simply stated, Bailey and Fritz's affidavits contain no facts that undermine the State's case against Gillispie, which was based substantially on the eyewitness identifications. Rather, their affidavits merely established that the detectives believed that they had no

30

credible evidence, while they were conducting the investigation, that
Gillispie was the perpetrator. The detectives' opinions that Gillispie
does not resemble the composites and that he does not fit the profile
of the person who they believed would commit this type of rape
offense do not tend to establish Gillispie's innocence or to undermine
the State's case against him, and the bases for those opinions—a
comparison of Gillispie to the composites and information regarding
Gillispie's background—was known to the defense.

Based on the record before it, the trial court did not err in finding, as
a matter of law and without a hearing, that no Brady violation
occurred with respect to the supplemental reports.

Gillispie's assignment of error is overruled ... at to the supplemental
reports.

*Gillispie,* 2009 WL 2197052 at *8-20; Return Att. 5, PageID 1528-47.


## Positions of the Parties


Mr. Gillispie argues in support of his sole Ground for Relief that at trial his counsel
attempted to raise the defense that the inexperienced, rookie detective Scott Moore conducted the
investigation of Mr. Gillispie in a reckless and thoughtless manner and that counsel spent a
significant amount of time examining Det. Moore about his actions and judgments in the case and
why he had focused on Mr. Gillispie as opposed to other seemingly more viable suspects.  *Id.*,
PageID 36-37.  Mr. Gillispie alleges that as in *D'Ambrosio,* there were reports that existed but which
the State did not disclose and which completely contradicted Det. Moore's and the State's theory
of the case.  *Id.*, PageID 37.  Mr. Gillispie claims that the original investigating detectives wrote the
reports at issue and that the reports reflect that the original detectives did not consider him (Mr.
Gillispie) a viable suspect.  *Id.*  Mr. Gillispie claims further that if his trial counsel had those reports

in their possession, they would have had "tremendous ammunition to further impeach the integrity

of Moore's investigation." *Id.*

Mr. Gillispie alleges that information contained in the reports, or that defense counsel

would have learned through further investigation had the reports not been improperly destroyed or

hidden, include:

> (1) A psychological profile of the likely perpetrator had been
> developed by the department that Det. Moore simply disregarded
> when he decided to go after Mr. Gillispie;
>
> (2) A victim report seeing the pants size of the perpetrator, and this
> did not match the size of pants that someone with Mr. Gillispie's
> build would have worn;
>
> (3) The person who brought the "tip" regarding Mr. Gillispie to the
> attention of the police department had an apparent vendetta against
> Gillispie; the experienced detectives in charge at the time knew that
> vendetta tips are common and are not to be given much weight;
>
> (4) Mr. Gillispie did not match the physical description of the
> perpetrator; and
>
> (5) More experienced detectives in the department—the same
> detectives who previously trained and supervised Moore—believed
> that it would be improper to use a photo lineup in this case due to the
> passage of time (faded memories of victims) and the fact that so
> many characteristics of the perpetrator turned on subtle distinctions
> such as hair color shade or sound of voice.

*Id.*, PageID 39.  Simply stated, Mr. Gillispie's position is that had his defense counsel known these

things, they would have had  "substantial ammunition with which to impeach the caliber and

integrity of Moore's investigation" and the State's failure to disclose the reports constituted a *Brady*

violation that entitles him to habeas relief.  *Id.*

Respondent first argues that Mr. Gillispie's Petition is barred by the AEDPA statute

of limitation.  Doc. 16, PageID 143.  Respondent alleges that Mr. Gillispie's conviction became final

upon the expiration of the time of seeking direct review under 28 U.S.C. § 2244(d)(1)(A), the Ohio Supreme Court's decision denying leave to appeal was filed August 26, 1993, and therefore, absent tolling, Mr. Gillispie should have filed his Petition in November, 1994. *Id.*, PageID 143-44. Respondent points out that although the running of the limitations period may be tolled during the pendency of a "properly filed" application for state post-conviction relief or other collateral relief with respect to the pertinent judgment or claims under 28 U.S.C. § 2244(d)(2), there were multiple occasions after 1994 when there were no state collateral proceedings pending for more than a year. *Id.*, PageID 144. Respondent argues further that, while Mr. Gillispie did have a post-conviction proceeding pending from March 30, 1994, to June 14, 1995, when the Ohio Supreme Court denied jurisdiction to hear Mr. Gillispie's appeal from the prior courts' denial of his post-conviction petition, he filed nothing in the state or federal courts until over two years after the conclusion of that proceeding, when on September 4, 1997, he filed in the trial court his motion to preserve evidence. Respondent's position is that under these facts, Mr. Gillispie's federal habeas time period expired on June 14, 1996. *Id.* Respondent also argues that Mr. Gillispie may not avail himself of a later AEDPA start date under 28 U.S.C. § 2244(d)(1)(D) because he had access to the factual predicate underlying his *Brady* claim in that Det. Fritz, the same former police detective who allegedly reviewed and filed the documents in question, served as Mr. Gillispie's investigator from the time of his initial trial. *Id.* Respondent argues further that whether or not Mr. Gillispie questioned Det. Fritz on this subject matter does not change the fact that he could have exercised such diligence well before February 13, 2008, the date he essentially filed the post-conviction petition alleging the claim he brings in the instant petition. *Id.*

Respondent argues in the alternative that regardless of the time bar, Mr. Gillispie's

Petition is without merit. *Id.*, PageID 145. After acknowledging the State's obligation to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment, Respondent first alleges that there is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available from another source because in such case, there is really nothing for the government to disclose. *Id.*, PageID 150. Respondent alleges further that the reports at issue do not meet the "materiality" prong of *Brady* because they would not establish Mr. Gillispie's innocence or even undermine the State's case based on the witnesses' identification against him and therefore, as the state court of appeals concluded, there was not a reasonable probability that had the State disclosed the evidence, the result of the proceeding would have been different. *Id.*, PageID 150-51.

Next, Respondent argues that even if the reports were constitutionally "material," the state appellate court erred by rejecting the trial court's finding that the State did not need to disclose the supplemental reports because Mr. Gillispie had access to the information via alternative sources, to wit: Det. Fritz. *Id.,* PageID 160.

In Reply, Mr. Gillispie argues first that *Kyles v. Whitley,* 514 U.S. 419, 445-46 (1995), and "a line of cases" therefrom, hold that a *Brady* violation occurs when the State fails to disclose information or materials that impeach the quality of the police investigation, show that the police investigation was shoddy or negligent, or cause the jury to question the "thoroughness and good faith" of the police investigation. Doc. 27, PageID 1899-1900. Mr. Gillispie argues further that the state courts consistently ignored this sub-component of the *Brady* doctrine as if it does not exist. *Id.,* PageID 1900. Mr. Gillispie also argues that part of his trial defense was that Det. Moore, a rookie detective at the time, acted negligently and recklessly, and that the reports which are the

34

subject of this claim would have supported that theory. *Id.,* PageID 1907.

Mr. Gillispie argues next that he did not have access to the reports at issue simply because former Det. Fritz worked as an investigator for the defense and therefore the state court of appeals decided that issue correctly. *Id.*, PageID 1908. Essentially, Mr. Gillispie's position is that Det. Fritz had a limited role in his defense as an investigator and did not have access to nor did he review the entire file. *Id.*, PageID 1914. Mr. Gillispie argues that because he did not review the discovery which the State produced, Det. Fritz would not have known whether the reports at issue were missing. *Id.*

## Analysis

The AEDPA includes a one-year period of limitations for habeas petitions brought by prisoners challenging state court judgments. The statute provides:

> (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due

diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Mr. Gillispie's *Brady* claim relates to newly-discovered evidence. That evidence includes information in the police file which included, *inter alia,* a psychological profile of the likely perpetrator, a victim report with respect to the perpetrator's pants size, and a report that the detectives who originally investigated the matter did not consider Mr. Gillispie a viable suspect. The state courts accepted that the discovery of this new evidence in or around November 2007 was timely for purposes of his February 23, 2008, petition for post-conviction relief and motion for new trial (Appx. to Return of Writ, PageID 1140). Therefore this Court accepts the November 2007 date as the date on which the statute of limitation begins to run under 28 U.S.C. § 2244(d)(1)(D)[2].

As noted above, Mr. Gillispie filed a state post-conviction petition with respect to his *Brady* claim on February 23, 2008, the trial court denied the petition on August 12, 2008, the court of appeals affirmed the trial court on July 24, 2009, and on December 2, 2009, the Ohio Supreme Court denied Mr. Gillispie leave to appeal and dismissed his appeal as not involving any substantial constitutional question. Mr. Gillispie filed his habeas petition in this Court on December 15, 2009. Therefore the statute of limitations ran for a total of 128 days, having been tolled during the pendency of his state exhaustion efforts pursuant to 28 U.S.C. § 2244(d)(2). That State's limitations

---

[2] Respondent's analysis has the statute expiring in June, 1996, but that is only two months after the AEDPA was enacted. No habeas petition filed before April 24, 1997, is barred by 28 U.S.C. § 2244 because the earliest date on which the statute could begin to run was the AEDPA's effective date, April 24, 1996.

36

defense is therefore unavailing.

The State has a duty to produce exculpatory evidence in a criminal case. If the State withholds evidence and it is material, the conviction must be reversed. *Brady v. Maryland*, 373 U.S. 83 (1963). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 683 (1985). "The proper *Brady* inquiry is whether the cumulative effect of the withheld evidence leads us to conclude that there is a reasonable probability that the result of the trial would have been different." *Apanovitch v. Bobby*, 649 F.3d 468, 477 (6th Cir. 2011), *citing Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008).

Impeachment evidence as well as exculpatory evidence falls within the rule. *Bagley*, 473 U.S. at 676. A reviewing court is to assess materiality in light of the evidence actually presented at trial. *Kyles v. Whitley*, 514 U.S. 419 (1995). Materiality does not require a showing by a preponderance that the ultimate result would have been acquittal. *Id.* at 434 (citations omitted). Once constitutional error under *Bagley* is shown, there is no need for further harmless error analysis. *Id.* at 435; *Castleberry v. Brigano*, 349 F.3d 286 (6th Cir. 2003); *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997). The *Bagley* test is to be applied to suppressed evidence collectively considered, and not on an item-by-item basis. *Kyles*, 514 U.S. at 466.

"[T]here are relevant distinctions between impeachment and exculpatory evidence for *Brady* purposes. For instance, "[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be

37

cumulative, and hence not material." *Jalowiec v. Bradshaw*, 757 F.3d 293, 313 (6th Cir. 2011), *quoting Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) (internal quotation marks omitted).

  *Brady* "is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). There is no *Brady* violation where the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information or where the evidence is available to the defendant from another source. *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991). This includes information that is available from public records, e.g., of a witness's criminal record. *Storey v. Vasbinder*, 657 F.3d 372, 380 (6th Cir. 2011), citing *Owens v. Guida*, 549 F.3d 399, 418 (6th Cir. 2008). No *Brady* violation occurs where the government does not disclose witness statements but the defendant knew that the witness had potentially exculpatory information. *United States v. Todd,* 920 F.2d 399, 405 (6th Cir. 1990).

  There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene,* 527 U.S. 263 (1999):

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id., at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." Id., at 438, 115 S.Ct. 1555. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437, 115 S.Ct. 1555.

These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

*Id.* at 280-81; a*ccord, Jamison v. Collins*, 291 F.3d 380 (6ᵗʰ Cir. 2002).

To prevail on a *Brady* claim, the petitioner must show that the withheld exculpatory evidence was material; that is, it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Van Hook v. Bobby,* 661 F.3d 264, 267 (6ᵗʰ Cir. 2011), *quoting, Kyles,* 514 U.S. at 435.

This Court owes deference to the state court's decision unless it was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent (28 U.S.C. § 2254(d)(1)) or it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (28 U.S.C. § 2254(d)(2)).

First, this Court agrees with the state court that the State was required, pursuant to *Brady*, to disclose the material at issue.  However, in light of the total record, the Court finds that

it cannot defer to the state courts' materiality conclusion.

Briefly stated, the evidence in this case established that the crimes for which Mr. Gillispie was tried and convicted occurred in August 1988 and Mr. Gillispie was arrested and charged in the fall of 1990. In late 1989 or early 1990, during the initial investigation, detectives Fritz and Bailey considered Mr. Gillispie as a suspect after Rick Wolfe brought to the detectives a picture of Mr. Gillispie whom Mr. Wolfe had just terminated as an employee at General Motors (GM). The investigating detectives noted that the "Wanted" poster for the case had been posted for almost two years at GM, but that Mr. Wolfe did not bring Mr. Gillispie to the detectives' attention until after he (Mr. Wolfe) had a fight with Mr. Gillispie and terminated his employment. Nevertheless, the original investigating detectives eliminated Mr. Gillispie as a suspect because he did not fit the physical description of the rapist which the victims had given nor did he fit the profile of the rapist. Eventually, Detective Fritz informed Mr. Wolfe that he and Det. Bailey did not consider Mr. Gillispie a good suspect and that there were not going to be charges brought against him. At some point after Dets. Fritz and Bailey had eliminated Mr. Gillispie as a suspect, Mr. Wolfe again approached the detectives about the rape case and brought several photographs to them. Because the investigators had already eliminated Mr. Gillispie as a suspect, Det. Fritz just put the photos into the case file. Det. Bailey prepared supplemental reports describing the events involving Mr. Wolfe, their investigation of Mr. Gillispie, their elimination of Mr. Gillispie as a suspect, and their reasons therefor.

When Det. Moore, who had recently been promoted to detective, took over the investigations in June 1990 almost two years after the crimes were committed, he contacted the victims and presented a photo spread to them. The photo of Mr. Gillispie was closer and larger than

the other photos in the spread and, unlike the other photos, had a matte finish.  The victims identified Mr. Gillispie.

There was, of course, absolutely no physical evidence that connected Mr. Gillispie to the crimes.  However, the parties agree that at the trial, the three victims each testified that Mr. Gillispie was the person who committed the crimes.  Nevertheless, at some point in deliberations the jury was deadlocked eight to four in favor of *acquittal*. See *Gillespie* [sic]*, 1993 WL 10927 at *3.  It was not until the trial court delivered an *Allen* charge to the jury that it convicted Mr. Gillispie That fact sheds light on the relative weakness of the case the State presented to the jury.

The jury never heard testimony about the original investigating officers, Dets. Fritz and Bailey, eliminating Mr. Gillispie as a suspect nor the reasons why they eliminated him. While Dets. Fritz's and Bailey's opinions as to why Mr. Gillispie was not a good suspect certainly do not directly go to the issue of Mr. Gillispie's guilt or innocence, they clearly go to the quality of the investigation which took place subsequent to Dets. Fritz's and Bailey's investigation. The withheld information is material which would have allowed Mr. Gillispie's counsel to impeach Det. Moore with respect to his investigation of the crimes for which Mr. Gillispie was tried and convicted.  *Cf, D'Ambrosio v. Bagley,* No. 1:00-CV-2521, 2006 WL 1169926 (N.D.Ohio Mar. 24, 2006), *aff'd,* 527 F.3d 489 (6th Cir. 2008).  In view of  the State's case, that information "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *VanHook, supra.*

"Materiality" for purposes of *Brady* analysis is a mixed question of law and fact. *United States v. Phillip*, 948 F.2d 241 (6th Cir. 1991).  The state courts' determination that the evidence in question is not material is both an unreasonable determination of the facts in light of the

41

evidence presented to those courts and an objectively unreasonable application of *Brady* and its progeny.

This Court concludes that Mr. Gillispie's Ground for Relief 1 is meritorious. Specifically, the Court finds that Mr. Gillispie was denied his right to due process pursuant to the Fourteenth Amendment as interpreted in *Brady,* to be apprised of all material exculpatory and impeachment information which the State holds.

Accordingly, the Petition for Writ of Habeas Corpus is granted.  The State of Ohio is ordered to release Petitioner from custody unless he is again convicted at a trial commencing not later than July 1, 2012.

December 15, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

J:\Gillispie_merits.wpd

42